IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BILLY M. AUSTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:09CV1096-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

On February 28, 2007, plaintiff Billy M. Austin filed applications for disability
insurance benefits and supplemental security income, alleging disability on the basis of
problems with his back. (R. 160). On January 23, 2009, after the claim was denied at the
initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered
a decision on February 26, 2009. The ALJ concluded that plaintiff suffered from the severe
impairments of degenerative disc disease of the lumbar spine and chronic pain. He found
that plaintiff's impairments, considered in combination, did not meet or equal the severity
of any of the impairments in the "listings" and, further, that plaintiff retained the residual
functional capacity to perform his past relevant work as a grocery cashier. Thus, the ALJ
concluded that the plaintiff was not disabled within the meaning of the Social Security Act.
On October 14, 2009, the Appeals Council denied plaintiff's request for review and,
accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

Plaintiff seeks review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g)

and § 1383(c)(3).  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## BACKGROUND

Plaintiff filed his Title II and Title XVI applications in February 2007, claiming disability since January 5, 2007 due to problems associated with his back (R. 140-42, 160). The only medical treatment he then identified, however, was his treatment by Dr. Rex Butler

2

– *i.e.*, two office visits in November and December 2006.  (R. 162, R. 188-204).  When a claims examiner spoke with plaintiff on March 9th to confirm his medical treatment history and future treatment plans, plaintiff provided no additional information.  (R. 143).[1]

The claims examiner sent plaintiff a pain questionnaire, which plaintiff completed on March 16, 2007.  In the questionnaire, plaintiff indicated that he has had back pain since he was fifteen years old[2] which has grown worse over the years, and that the pain also affects his shoulders, arms, legs, and head.  He stated that he has a slipped disc and that he previously had shots which made his back problem worse because it has caused cramps "ever[] since."  He cooks a little and takes short drives.  He tries to fish, but is unable to do

---

[1] Plaintiff testified, contrary to the claims examiner's report of contact, that he "think[s] he told them over the phone when they [asked]" about his treatment for back pain by two doctors  – possibly named Sandovitch and Kolouisa – in Crestview in 2000, several years before he filed the present applications. (R. 40-42).  In the pain questionnaire he completed after the contact by the claims examiner, plaintiff mentioned having a "disc slipped" and "shots to block nerves," but he did not identify either the time frame or the names of his physicians. (R. 145). At the administrative hearing, plaintiff testified that Dr. Sandovitch gave him two epidural shots and Dr. Kolouisa took x-rays and showed plaintiff what was wrong with his back. ( R. 40-42). The ALJ held the record open for two weeks so that plaintiff's counsel could obtain and file records from these two doctors. (R. 51-52).  Plaintiff's counsel filed additional records of treatment in August 1999 at the Andalusia Regional Hospital ER (Exhibit 10F), but he filed no records from Drs. Sandovitch or Kolouisa.  The consultative physical examiner, Dr. Vijay Vyas, reported some difficulty in eliciting information from plaintiff regarding his medical history.  (R. 205)("This patient is very secretive and he will not give much history.  I had to ask a lot of leading questions.  He wouldn't . . . tell me about what kind of treatments he had, what kind of x-rays he had.  I had to ask him a lot of leading questions but from what I gather, the patient said he saw a physician in Crestview.  After MRIs he was given some epidural shots.  He says the first shot helped him quite a lot but the second shot made him cramp all over and he says he never went back. . . . At first he told me that he had not seen any doctor but then he told me that he went to see Dr. Butler about a year ago.").  Plaintiff told Dr. Vyas that the treatment in Crestview was "about ten years ago," *i.e.,* around 1997. (Id.).

The Commissioner is required to develop the medical record for at least the twelve months preceding the filing date of the claim.  See 20 C.F.R. § 404.1512(d), §416.912(d).  However, "[t]he claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).  The court finds no error in the Commissioner's failure to obtain plaintiff's treatment record from Drs. Sandovitch and/or Kolouisa.

[2] At the time of his application, plaintiff was 53 years old.  (R. 140).

much of that.  He reported that he is in pain all day, and during the night, but he takes no pain medication.  (Exhibit 8E, R. 166-68).  In a daily activities questionnaire that he completed on April 6, 2007, plaintiff reported that he is able to: care for his personal needs, except that he needs help to wash his back; cook "quick fix meals, out of the box [and] grill sometimes[;]" do light cleaning; and shop for his personal needs one or two times a month. He indicated that his cousin and his girlfriend do most of his shopping, and that his children and friends do most of his cleaning, laundry, and mopping.  He plays video and card games. He watches television for two to three hours at a time and is able, most of the time, to pay attention to the programs and remember them.  He reads three to four times a week for thirty minutes at a time and sometimes has to re-read to remember what he read.  He leaves his house once or twice a week, either driving himself or riding with someone else.  He goes to the store, drives about five miles to check on his son's horse, and rides to town with his son. He visits with family or friends two or more times a month, and his son visits "qu[ite] often" to check on him.  He speaks with friends or relatives on the telephone four or five times a week.  He feeds his pet bird and sometimes feeds the horse.  Because of his back, he is no longer able to go out dancing, shooting pool, swimming, fishing or hunting, but he gets together with his family and friends to watch movies and ball games.  (Exhibit 9E, R. 170-74).

At the hearing, plaintiff testified that he drives short distances.  He stated that he does not read the newspaper much because he "can't hardly see."  He has a large print Bible which he tries to read.  He stated that his last job was doing satellite dish installations.  He worked at that job for three years, until November 2006, when he was "laid off because of a speeding

ticket." He said that his employer told him that he could continue working if he drove his own truck, but he did not have the money to buy the insurance. When the ALJ noted that "[i]t wasn't because of your health," the plaintiff responded, "Yes, sir, that was one, main thing is I got where I couldn't crawl under the houses, couldn't crawl in the attic." (R. 24-28). Plaintiff testified that he has previously worked for a trailer manufacturer, screwing siding on trailers, and has also had a job tearing down mobile homes. He has worked at a mushroom farm. He has also worked as a cashier at a grocery store, cleaning and selling guns at a gun shop, and at a cotton gin. (R. 28-32).

Plaintiff testified that he lives with his mother in a three bedroom trailer. He no longer has a horse, as he gave it to his son when the last of the money from his retirement account with Satellites Unlimited ran out, in about January or February of 2008. (R. 33). He stated that he can't work because his "back and lungs and all will not let [him] do anything anymore." (R. 33-34). He stated that he has had muscles pulled in his back and that doctors have told him he has "slipped discs." He stated that all of his "cushion is going out of [his] back" and "[n]umber seven is bone to bone." (R. 35). When the ALJ asked him if he had any problems other than his back, plaintiff stated, "I get where I cannot concentrate anymore on hardly anything. I can't, I don't know just, there's been so much turmoil in my life, I'm going crazy." (R. 35-36). He stated that he has no money to go to a doctor. When the ALJ asked him what he does all day, he responded that he "just piddle[s] around the house . . . and tr[ies] to survive, that's it." (R. 37). He stated that he and his girlfriend broke up over a year previously and that he sees his daughter and son "every once in a while[.]" (R. 38). He

drives to Andalusia, a distance of 22 miles, once a month for groceries, but has to stop halfway, "get out and stomp a little bit" and drive the rest of the way.  (Id.).  His cousin cleans the house and does the laundry.  Plaintiff cooks in the microwave.  He walks around in his yard, tries to watch "a little" television and lies down, but he cannot do much of anything at one time.  (R. 40).

Upon questioning from his attorney, plaintiff testified that he has been to doctors about his back since 1979 and that he saw Dr. Kolouisa and had epidurals from Dr. Sandovitch in Crestview in "about 2000," when he hurt his back working at the mushroom farm.  After that, he did not go to any doctor until he went to see Dr. Butler.[3]  (R. 40-43).  Plaintiff stated, "If you ain't got no money, you can't go to a doctor."  (R. 43).  Plaintiff testified that he went to Dr. Butler for "three weeks or something like that" until his insurance "lapsed out."  (R. 43).[4]  Plaintiff testified that he then "kept calling around" and learned from the Medicaid office that Dr. Johnson would see him for $15. Plaintiff's daughter paid for plaintiff to go see Dr. Johnson.  (R. 44).  Dr. Johnson made an appointment for plaintiff to see a doctor in Dothan for a lesion over his eye, but plaintiff could not afford the $250 fee.  (R. 46).  He takes over-the-counter Tylenol or Doan's back pills for his pain, since Dr. Johnson discontinued his prescription for pain medications after "something else" showed up in plaintiff's drug test.  (R. 36, 44-46).  He is in constant pain, every day, at a level of "seven or eight" in dry weather, and at a level such that he cannot "function at all"

---

[3]  Plaintiff first saw Dr. Butler on November 29, 2006.  (R. 198).

[4]  Plaintiff apparently then had medical insurance from his employment as a satellite dish installer, a job he held for "[a]lmost three years[,]" until November 15, 2006.  (R. 27-28, see R. 202).

in rainy weather.  He sleeps about four hours total each day, consisting of about two hours from 3:00 a.m. to 5:00 a.m. and naps during the day. (R. 46-47).  When he last worked and had income and insurance, he still took only over-the-counter medications because he does not like to take drugs and he "couldn't take drugs being on the road with the Satellites Unlimited." (R. 48).  His blood pressure was "in pretty good shape" until he could no longer exercise.  He is not able to afford blood pressure medication and "has not been able to go get [his] blood pressure medicine filled in a long time." (Id.).

Plaintiff further testified that no doctor has suggested that he go to counseling and that he has "never been to a doctor enough to have them do anything."  It has not ever occurred to him to try to seek counseling.  He does not have money to go to a psychologist or counselor if they were to charge him, and he did not know that Southwest Mental Health, which has an office in Andalusia, will do counseling based on his ability to pay.  (R. 49-50).

### Medical Evidence Regarding Back Impairment

On August 22, 1999, plaintiff sought treatment at the Andalusia Regional Hospital emergency room complaining of lower back pain radiating down both legs after he had picked up a log at work.  The physician noted slight tenderness to palpation in plaintiff's lumbosacral area, but a negative straight leg raise, 5/5 strength on motor examination, 2+ reflexes, and good sensation to pinprick and light touch.  The doctor diagnosed low back pain with radiculopathy and prescribed Motrin.  (R. 262; see also R. 258).  On August 26, 1999, plaintiff returned to the hospital, reporting that he was out of pain medication.  The doctor noted decreased sensation to pinprick on the left, and a slightly positive straight leg raise on

the left.  He diagnosed sciatica, left.  (R. 258).

Plaintiff's medical records from Dr. Butler demonstrate that he first sought treatment from Dr. Butler on November 29, 2006, over seven years after his ER visits, with chief complaints of back pain and headaches.  (R. 198).[5]  Dr. Butler performed a complete physical. For his clinical musculoskeletal examination, Dr. Butler reported "FULL NORMAL EXAM: No swelling, masses, redness, or tenderness; normal strength and tone; FROM [full range of motion]" and, on examination of plaintiff's neck, he noted "Normal; non-tender; no swelling; FROM; normal thyroid."  (R. 201).  Dr. Butler planned to x-ray plaintiff's back and, possibly, obtain an MRI if plaintiff "entertains the idea of pain management again." (R. 202).[6]  He assessed, *inter alia*, back pain and cervical pain and prescribed Mobic, a nonsteroidal anti-inflammatory drug, and Ultram, a narcotic analgesic.[7] Plaintiff returned a week later, on December 7, 2006, for follow-up.  The nurse practitioner's treatment note states, "Here today for Echo and results of lab work. [Patient] has chronic backpain and headaches.  Pt takes Lortab prn and this does help some."  (R. 188).[8]  Although

_____

[5]  At that time, plaintiff reported having had epidural injections "about two years ago" – *i.e.*, in late 2004 – in his neck and back.  (R. 198).

[6]  Plaintiff also discussed other problems with Dr. Butler and Dr. Butler's note includes a long list under the heading "[a]ssessments made or addressed during the encounter."  (R. 198-202).  The court here discusses only plaintiff's alleged back impairment – the physical impairment on which he based his claim for disability – but has, of course, reviewed Dr. Butler's comprehensive notes.  Plaintiff told Dr. Vyas that he "went [to Dr. Butler] for his back, but [Dr. Butler] did all kinds of tests."  (R. 205).  The court has also noted the evidence concerning the other physical diagnoses of record by Dr. Johnson (Exhibit 8F) and Dr. Vyas (Exhibit 2F).

[7]  See H.M. Silverman, Pharm. D., ed., *The Pill Book* (14th ed. 2010) at pp. 771-72, 815-16.

[8]  Dr. Butler diagnosed mild tricuspid valve regurgitation as a result of the echocardiogram. (R. 189). He planned to schedule plaintiff for ultrasound testing and he started plaintiff on Crestor for his hyperlipidemia.  (R. 190).  Dr. Butler had not prescribed Lortab (see R. 188, 202) and there is no evidence

plaintiff reported continued low back pain (R. 188) and Nurse Smith and Dr. Butler again assessed back pain (R. 189-90), the notes do not reference a musculoskeletal examination or associated findings on plaintiff's follow-up visit, and Dr. Butler's treatment notes do not include the results of any back x-rays or MRI.[9]

On May 1, 2007, plaintiff reported to Dr. Vijay Vyas for a consultative physical examination.  With regard to plaintiff's musculoskeletal examination, Dr. Vyas wrote:

> The patient has vague tenderness in the neck and the movements are slightly painful but not restricted.  The shoulders, scapular areas are somewhat tender and the patient has some pain raising the arms above the shoulder level.  The elbows, wrists and fingers are vaguely tender but they are not swollen or deformed.  There is tenderness in the lumbosacral area.  The leg raising at the hip joints is normal up to about 30 degrees and passively he let me raise to about 50-60 degrees but he says it hurts him quite a lot.  The knees and ankles are unremarkable.  The calf and thigh are normal.  His gait is slow.  He walks with a little limp on the left foot.  He has a gunshot wound old on the left foot on the dorsum side in the middle part.  He says that causes him pain.  He cannot walk on the toes and heels because he is unsteady.  He can bend forward about 45-50 degrees.  He could bend backward about 5 degrees, sideways about 10 degrees.  He says he cannot squat much.  He tried a little bit but would not squat all the way down.

(R. 208).  Dr. Vyas noted that the neurological examination was "unremarkable," with normal sensation and reflexes and "possibly very minimally decreased [power] in the legs but it is mainly from the muscular pain." (Id.).  Dr. Vyas' impressions included

---

in the record indicating who was then prescribing Lortab for the plaintiff.  Plaintiff did not return to Dr. Butler for further treatment after the December 7, 2006 visit; he testified that this was because his insurance had "run out."  (R. 43-44).  Dr. Butler's treatment note for November 29th indicates that all of the testing "needs to be done within the next month[,]" because plaintiff was "on leave of absence from work."  (R. 202).

[9] Plaintiff testified that Dr. Butler was doing a "total overall" physical which included a CT scan and, he thinks, an MRI.  (R. 43).  The record includes some testing results, but no report of an MRI or CT scan. (See Exhibit 1F, 10F).

"[l]umbosacral pain with previous injury, possibly some traumatic arthritis[,]"[10] and

"[g]eneralized pain in the neck, shoulders, arms, cannot rule out fibromyalgia."[11]  (R. 208).

Dr. Vyas ordered lumbar spine x-rays.  The radiologist indicated:

> Three views of the lumbar spine show vertebral bodies to be of normal vertical
> height and well aligned without evidence of fracture.  here is vacuum disc
> phenomenon at L5-S1 where the interspace is diffusely narrowed and
> narrowing of the L1-L2 disc space is present with large anterior osteophyte,
> but the interapophyseal joints are symmetric and the sacroiliac joints are open.

(R. 210).  Her impression was "evidence of degenerative disc disease at L1-L2 and L5-S1.

(Id.).[12]

Ten months after the consultative examination, plaintiff sought treatment at the Red

Level Clinic, where Dr. Johnson would see him for fifteen dollars.  (R. 44, 251-52).  Plaintiff

complained of chronic pain and lumbar disc disease and, also, of high blood pressure.  He

----

[10]  Plaintiff argues, incorrectly, that Dr. Vyas diagnosed "[l]umbosacral pain with previous *surgery*[.]"  Doc. # 10, p. 12)(emphasis added).

[11]  Plaintiff argues that, because of Dr. Vyas' diagnosis, the ALJ had a duty to seek a consultative exam and tests from a specialist in rheumatology.  (Doc. # 10, p. 22).  However, Dr. Vyas did not diagnose fibromyalgia and his indication that he cannot rule it out is the only reference to fibromyalgia in the record. Plaintiff also reported to Dr. DeFrancisco, in giving him a history of illness during the consultative mental status examination conducted a week after plaintiff's appointment with Dr. Vyas, that he "has had back, neck, arm and shoulder problems."  (R. 212).  While plaintiff complained of low back pain, cervical pain, and leg pain to Dr. Butler, he did not complain of shoulder or arm pain.  (R. 199).  Dr. Butler noted examination findings of "Normal; non-tender; no swelling; FROM; normal thyroid" as to plaintiff's neck, and "FULL NORMAL EXAM: No swelling, masses, redness, or tenderness; normal strength and tone; FROM" for the musculoskeletal examination.  (R. 201).  Dr. Butler's notes for plaintiff's follow-up visit records plaintiff's complaint of low back pain, but no complaint of upper back, shoulder, cervical or arm pain.  (R. 188).  The examination of plaintiff's neck was, again, noted to be normal, and there is no other notation of results of a musculoskeletal examination.  (R. 189).  Dr. Johnson's treatment notes for plaintiff's five office visits to him between March and June of 2008 record no complaint by the plaintiff of shoulder, neck or upper extremity pain, and no examination noting tenderness in these areas.  (R. 246-52).

[12]  In his brief, plaintiff initially states that the x-rays were from 1999  (Doc. # 10, p. 5), and later states that they were performed in 2007. (Id., p. 11).  The latter date is correct.  (See R. 257).

stated that he "has otherwise been in good health." Dr. Johnson's clinical examination notes indicate symmetrical reflexes, negative straight leg raise, and "good motion of all joints including the back." (R. 252). Dr. Johnson's assessments included chronic pain and lumbar disc disease. He prescribed methadone, had plaintiff sign a pain contract, and "emphasized the need to bring the bottle with any unused tablets back each time that he comes." (R. 253).[13] Two days later, plaintiff returned to Dr. Johnson complaining that the Zestoretic caused him to have muscle cramps and the methadone made him nauseous. He told Dr. Johnson that he "has taken Lortab in the past and got good relief and it did not make him sick." Dr. Johnson substituted Lisinopril for the Zestoric, disposed of the Methadone tables and started plaintiff on Lortab. He noted that plaintiff had "a complete [range of motion] of his back[,]" negative straight leg raise in both legs and symmetrical reflexes. (R. 250). Plaintiff next saw Dr. Johnson on April 1, 2008. He reported "good relief with Lortab but he is out and needs a new prescription." Dr. Johnson again noted symmetrical reflexes, negative straight leg raise and complete range of motion of plaintiff's back. He increased plaintiff's Lortab prescription, giving him an additional 30 pills because the 120 pills did not last plaintiff for the full month. Plaintiff had no Lortab pills in his bottle "but said that he had 3-4 at home." Dr. Johnson had plaintiff submit a urine sample for a drug screen and scheduled him to follow up in a month. (R. 249-50).

On May 1, 2008, plaintiff again reported "good relief" of his back pain with Lortab, and that he was out of the medication. He told Dr. Johnson that he had been "knocked down

---

[13] Dr. Johnson prescribed Zestoretic for plaintiff's hypertension. (R. 251-52).

by a horse a couple of weeks ago" and his pain had since been worse.  Dr. Johnson explained

that he would have to stop prescribing narcotics for the plaintiff because, in addition to

hydrocodone, his drug screen also showed propoxyphene.  Dr. Johnson again noted complete

range of motion of plaintiff's back, negative straight leg raise and symmetrical reflexes.  Dr.

Johnson explained that he was giving plaintiff his last prescription for Lortab but that, if

plaintiff did not find another doctor to treat his back pain, to return for a few more Lortab

pills so that he could taper off of the medication.  Dr. Johnson told plaintiff that he would

continue to treat his blood pressure.  (R. 248, 253).[14]  On June 5, 2008, plaintiff said that he

had not found another doctor and asked Dr. Johnson for a tapering dose of the Lortab.  Dr.

Johnson again noted "complete ROM of his back," negative straight leg raise and

symmetrical reflexes.  (R. 246-47).[15]

### Medical Evidence Regarding Mental Impairment

When plaintiff sought treatment from Dr. Butler on November 29, 2006 for his back

pain, he reported that he also had a "depressed mood."  (R. 199).  Other than recording

plaintiff's complaint of "depressed mood" (R. 199) or "depression," (R. 198), Dr. Butler's

---

[14] Plaintiff testified that he had not taken any additional drugs intentionally and that he had "no idea" why he failed the drug test.  He admitted that it was possible that he had taken his mother's pain medication – Darvocet – but said, "[I]f I did, I didn't know it."  (R. 36, 45).  Plaintiff argues that Dr. Johnson terminated plaintiff's pain medication "for an improper drug screen" and that plaintiff had "explained that there was a mistake with the drug screen such that he had not intentionally taken improper narcotic prescription medications."  (Doc. # 10, p. 12).  The fact that plaintiff may have taken the Darvocet unintentionally does not render the drug test either a "mistake" or "improper," as the drug screen does not, obviously, test for intent.

[15] Dr. Johnson again prescribed Lisinopril for plaintiff's high blood pressure.  Plaintiff missed a follow-up appointment on September 2, 2008 and did not, thereafter, return to Dr. Johnson for treatment. (Exhibit 8F, R. 246-47).

examination notes include no reference to evaluation of plaintiff's mental status. Dr. Butler assessed major depression, and prescribed Wellbutrin. (R. 198-203). Dr. Butler's treatment note for plaintiff's return visit one week later includes no reference to plaintiff's depression. (R. 188-90). In the consultative examination with Dr. Vyas on May 1, 2007, plaintiff told Dr. Vyas that he was "a little bit depressed" because "he has to live with his mother and doesn't have any money to buy medication." (R. 207).

The Commissioner sent plaintiff to Robert A. DeFrancisco, Ph.D., for a consultative mental examination on May 7, 2007. Plaintiff told Dr. DeFrancisco that he had a "ruptured and slipped disc," and that he "has had back, neck, arm and shoulder problems." He explained that he had left his job because of chronic pain. (R. 212). Dr. DeFrancisco noted:

> MOOD AND AFFECT:
>
> When the patient was asked to describe his mood, he said that he stays in pain all of the time. Indeed he comes into the office limping and holding his back. He appears to be extremely uncomfortable and this appears to be bonafide rather than exaggerated. His range of affect was constricted but appropriate to thought content.

(R. 213). In his mental status examination, Dr. DeFrancisco noted noted no deficiencies in the areas of "CONCENTRATION/ATTENTION AND CALCULATION" or "MEMORY." Under the latter heading, he noted, "Immediate, recent and remote memories were tested and found to be completely intact." (Id.) Dr. DeFrancisco recorded plaintiff's report of daily activities as follows:

> The patient says that he has always been an active individual having last worked in November of 2006 as stated previously. He did multiple things including electrical work, logging, construction and satellite installation. He said [that] he currently lives with his mother because his pain and physical

> condition will not allow him to move around as he once did.  He watches
> television for much of the day.  Interestingly he does have a girlfriend who is
> also applying for disability due to apparent psychiatric problems.  He does
> enjoy fishing if he is able to do that.  He goes to bed between 1:00 – 3:00 a.m.
> and rises about 8:00 a.m.  He describes his future as "not too good."

(R. 213-14).  Dr. DeFrancisco stated that he noted no attempt to malinger, and that plaintiff's "pain appeared to be bonafide and genuine."  He added, "From a psychological stand point he appears to be very uncomfortable as he moves and twists around and it does reveal that he walks with a noticeable limp.   He certainly intellectually can understand, carry out and remember instructions but it may be a problem from a physical aspect.  I believe this would probably preclude him from handling ordinary work pressures but that should, of course, be deferred to the MD's [sic].  He does have a life long history of severe back pain according to him as there were no medical records supplied to document that."  (R. 215).  Dr. DeFrancisco concluded:

> Diagnostic impression is 1) Pain Disorder associated with general medical
> condition 2) Normal Intelligence.  I can not appreciate any psychiatric
> disturbance other than his major pain problems.

(Id.).

Three and a half months later, plaintiff's counsel sent plaintiff back to Dr. DeFrancisco for another psychological examination.  Dr. DeFrancisco noted his previous evaluation and impression.  At this visit, plaintiff reported to Dr. DeFrancisco that "[h]e has had *numerous* epidural injections in the past."  (R. 240)(emphasis added).  Dr. DeFrancisco again observed that plaintiff's pain appeared to be legitimate, not exaggerated, and that "his concentration, attention, calculation, memory, fund and range of knowledge, vocabulary,

thought processes, judgment and insight all appear to be adequate." Dr. DeFrancisco wrote:

> Because of his alleged chronic pain he was given the Millon Behavioral Medical Diagnostic Test (MBMD). This test that he undertook indicates that no unusual responses were given suggesting an accurate profile. He does have a problem with eating too much and lack of exercise as well as too much smoking. He describes his psychiatric indicators as being quite miserable, tormented, worried and insecure. There is a pervasive since [sic] of anxiety and depression especially when it comes to functioning physically. He feels unable to sleep, and bend and stoop like he used to. He tends to dwell on his problems and he feels powerless about a remedy. He believes medical science has been unable to help him thus far.
>
> He has low self esteem and feelings of insecurity as well as difficulty communicating his symptoms accurately. He finds it difficult to accept his physical condition and he finds it difficult to manage it effectively. He is overly concerned about minor problems and he stresses high physical discomfort, stress and tension.
>
> He appears to have many functional deficits in terms of his range of activites and his ability to perform those activities. He appears to be pain sensitve, socially isolated with the anticipation that nothing is going to work very well for him though he does have acceptable spiritual faith.

(R. 241). Dr. DeFrancisco again assessed "Pain Disorder associated with general medical condition," and he added a second diagnostic impression: "Adjustment Disorder with Depression related to problem number one." He stated:

> He appears to have bonafide pain dysfunction. Because of that, it would be difficult for him to carry out the routine demands of a forty hour work week. He can handle his money from a cognitive perspective, but he does appear to have difficulty at this point carrying out his instructions. He appears to have severe and marked limitations.

(R. 241).

Dr. DeFrancisco completed an assessment form regarding plaintiff's functional limitations. He concluded that plaintiff would have "mild" limitations in understanding

instructions and in responding appropriately to supervision and to co-workers.  He concluded that plaintiff would have "marked" limitations or restrictions – defined on the form as an impairment which "seriously affects ability to function" – in most other rated areas, including: performing repetitive tasks in a work setting, performing simple tasks in a work setting, carrying out instructions in a work setting, maintaining social functioning, and activities of daily living.  As to "Estimated deficiencies of concentration, persistence or pace resulting in frequent failure to complete task in a timely manner (in a work setting or elsewhere)," Dr. DeFranscisco marked "frequent."  With regard to episodes of deterioration or decomposition in work or work-like settings, Dr. DeFrancisco indicated "marked" episodes.  He concluded that the limitations had lasted or could be expected to last for twelve months or longer.  His opinion as to the "earliest date the same level of severity existed" was "several years."  (R. 243-44).[16]

## ALJ Disqualification

Plaintiff contends that hearing transcript and the ALJ's treatment of Dr. DeFrancisco's reports in the decision demonstrates that the ALJ disregarded Dr. DeFrancisco's reports because plaintiff's attorney hired the psychologist.  He argues that "[i]f an ALJ depreciates the value of a psychologist's report because the claimant's attorney hired the psychologist, the ALJ must go outside the record for support for the conclusion that the doctor's report is entitled to less weight."  (Doc. # 10, p. 14).  Citing Miles v. Chater, 84 F.3d 1397 (11th Cir.

---

[16] Dr. DeFrancisco's conclusion that plaintiff had suffered "marked" functional limitations in almost all areas for "several years" (R. 244) is difficult to reconcile with plaintiff's report that when he was last employed – a mere ten months earlier – he worked ten hours per day and seven days per week in a job which he had held for nearly three years (R. 132-33).

1996), he concludes:

> [T]he ALJ's ruling *did not go outside the record* for support for his conclusion that Dr. DeFrancisco's report was entitled to less weight. Such a conclusion compromises the determination process and the case should be remanded for an unbiased reconsideration of Plaintiff's application for benefits with a different ALJ.

(Doc. # 10, pp. 14-15)(citation omitted)(emphasis added).  Plaintiff's argument reflects a misunderstanding of the holding in Miles, in which the Eleventh Circuit reversed the ALJ's decision on the basis of comments in the ALJ's written decision which revealed that the ALJ *had* relied on matters outside of the record -- specifically, the ALJ's own past experience with reports rendered by a practitioner for previous clients of the claimant's attorney. Miles, 84 F.3d at 1400-01 ("The ALJ's observations here with respect to the medical opinions rendered by McLain for McCluskey's clients, *without any evidence in support thereof*, reflect that the process was compromised in this case)(emphasis added).  The ALJ's failure to "go outside the record" does not demonstrate bias.[17]

Additionally, plaintiff has waived the disqualification issue.  In a letter submitted to the ALJ on the Monday following the hearing, plaintiff's counsel wrote:

---

[17]   During the hearing, the ALJ turned from his own questioning of the plaintiff to complain to plaintiff's counsel about the fact that Dr. DeFrancisco had, in the ALJ's view, submitted two conflicting reports. (R. 34-35). The ALJ stated that when he sees such a conflict, he "tend[s] to think that he is reporting only to the person who is paying for the report[.]" (R. 34). In his written decision, however – in contrast to the decision reviewed by the Eleventh Circuit in Miles, *supra* – the ALJ did not cite the fact that plaintiff's attorney had hired Dr. DeFrancisco as a reason for discounting Dr. DeFrancisco's opinion.  He cited other reasons, among them that the reports contained inconsistencies and that the opinion expressed by Dr. DeFrancisco is conclusory.  He further observed that it appeared that Dr. DeFrancisco had relied uncritically on the plaintiff's subjective complaints, which the ALJ had determined were unsupported by the treatment record and unreliable. (R. 17).  The record does not demonstrate that the ALJ has compromised the integrity of the Commissioner's decision-making process.  Accordingly, the court concludes that, even if plaintiff had not – as discussed *infra* – waived the issue, plaintiff is not entitled to relief on the basis of ALJ disqualification.

> [I] felt it necessary to immediately address concerns that I had after Friday's hearing. You seemed to indicate that I had paid Dr. DeFrancisco to provide a report that was favorable to my client, but contradicted his earlier consultative exam. I did pay for the report, but I merely sent my client to Dr. DeFrancisco for a more in depth examination and report with no requests about what I wanted the report or capacities evaluation to say. Bob and I are friends and I send all my clients, when appropriate, to him for an evaluation. These include clients where he has performed a prior consultative exam and those that haven't been to him. Additionally, the two reports really do not conflict as you will see in his letter.
>
> Second, you seemed to have your mind already made before the hearing. Your attitude was hostile to both me and my client. I got the impression that my request for additional time was perfunctory and, whatever we submit, it will make little difference as you already decided the case. I hope this is not the case and that you will give careful consideration to the documents as I find that they should have an impact on your decision.

(R. 186-87). Despite counsel's concern about the ALJ's hostility and/or bias, he did not request that the ALJ withdraw from the case, nor did he raise the issue before the Appeals Council. The Commissioner's regulations require that a claim of ALJ disqualification be raised at the earliest opportunity. Where the ALJ has not withdrawn from hearing the case, the claim of bias may be presented to the Appeals Council. See 20 C.F.R. §§ 404.940, 416.1440; see also Miles, 84 F.3d at 1440 ("When a claimant objects to the assignment of a particular ALJ to his or her case, he or she must notify the ALJ at the earliest opportunity. If the ALJ withdraws, the Associate Commissioner for Hearings and Appeals or his delegate will appoint another ALJ to conduct the hearing. If the ALJ declines to recuse himself, the claimant may seek reconsideration after the hearing by raising the issue before the Appeals Council.")(citing 20 C.F.R. § 404.940).

The plaintiff here, unlike the claimant in Miles, did not seek disqualification of the

ALJ at the earliest opportunity.  By failing to do so, he has waived the issue of ALJ bias.  See Kyler v. Astrue, 2010 WL 1142042, 11 (W.D. Pa. Mar. 24, 2010)("To preserve her claim of bias, Plaintiff must, at her earliest opportunity, before or during the hearing, move for the ALJ to recuse himself; the ALJ must then decide whether to continue the hearing or to withdraw.").

### Plaintiff's Past Relevant Work

A claimant who retains the residual functional capacity to perform his past relevant work – either as he actually performed that work or as it is generally performed in the national economy – is not disabled. 20 C.F.R. § 404.1520(f), § 404.1560(b); SSR 82-61. To support his conclusion that plaintiff's RFC does not preclude his past relevant work, the ALJ is required to compare plaintiff's RFC with the demands of his past relevant work.  See Lucas v. Sullivan, 918 F.2d 1567, 1574 n. 3 (11th Cir.1990). "The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit."  SSR 82-62.

In this case, the ALJ concluded that plaintiff is capable of performing his past relevant work as a "grocery cashier." (R. 18).  The ALJ's questioning of the plaintiff about this work was minimal:

> Q.  What did you do before you started tearing down the mobile homes?  What kind of work? . . . We got to go back 15 years is what I'm telling you and I

want to know what you did during the 15 years.

A.  Yeah, I'm trying.  My memory is not as good as it used to be.

Q.  Well, you're doing fine. Go ahead.

A.  I'm trying to think what I was doing before then.  I worked with Lord Delewis [phonetic] in a grocery store.

Q.  Doing what?

A.  Check out *mostly*.

Q.  Cashier?

A.  Yes, sir.

Q.  How long did you cashier for?

A.  Well, it didn't last but about six months on that and he sold out.

Q.  What did you do before then?

(R. 30)(emphasis added).  Although it is apparent from plaintiff's testimony that "check out" was not his only duty, the ALJ did not ask plaintiff about the nature of any of his other duties.  However, plaintiff provided additional details about this job in his work history report.  In the report, plaintiff listed his grocery store job as "meat cutter," and said that he cut meat, stocked groceries, operated the cash register and ordered supplies. He indicated that he worked twelve hours per day and that he spent five of those hours cutting and wrapping meat.  (R. 137).

"To support a conclusion that the claimant is able to return to his past relevant work, the ALJ must consider all the duties of that work and evaluate the claimant's ability to perform them in spite of his impairments." <u>Battle v. Astrue</u>, 243 Fed. Appx. 514, 522 (11th

20

Cir. 2007)(citing <u>Lucas v. Sullivan</u>, 918 F.2d 1567, 1574 (11th Cir.1990)).   The vocational

expert testified that plaintiff's job as "meat cutter" at Festival Foods was heavy and skilled.

(R. 53, 132, 137).[18]   She then testified that his job as a "grocery cashier" was light and semi-

skilled.  (R. 53).   In response to a question from the ALJ about a claimant who is "restricted

to light work because [of] degenerative disc disease of L1, L2, and L5/S1[,]" the VE

responded that the claimant could perform the light cashier work.[19]   Citing this testimony,

the ALJ concluded that plaintiff could perform his past relevant work as a "grocery cashier,"

"as actually and generally performed."  (R. 18).

The problem, however, is that plaintiff's job at the grocery store included a substantial

amount of "meat cutter" duties – heavy work which is precluded by plaintiff's RFC for light

work.  "Where it is clear that a claimant's past employment was a "composite job," an

administrative law judge may not find a claimant capable of performing [his] past relevant

work on the basis that [he] can meet some of the demands of [his] previous position, but not

all of them."  <u>Bechtold v. Massanari</u>, 152 F.Supp.2d 1340, 1345 (M.D.Fla. 2001), *affirmed*

*sub nom* <u>Bechtold v. Barnhart</u>, 31 Fed. Appx. 202 (11th Cir. 2001)(table); <u>see also</u> <u>Roberts</u>

<u>v. Astrue</u>, 2009 WL 722550, 3 (M.D.Fla. Mar. 18, 2009)("[W]here an individual cannot

perform any of his previous jobs, but only one or more tasks associated with his past relevant

---

[18]   It is possible that the ALJ and the vocational expert thought that the grocery store job plaintiff referenced in his testimony was a different job from the grocery store job described in his work history report. However, in view of the work history report and the ALJ's failure to question the plaintiff more thoroughly on this issue, there is no basis in the record for this conclusion.

[19]   The VE also testified that the claimant could perform the light retail gun shop job.  However, the ALJ did not reference or rely on this testimony in his decision; instead, he stated that the VE had testified that "the other prior jobs would be precluded."  (R. 18).

work, step four of the sequential evaluation must be resolved in favor of the claimant."). Even assuming that the ALJ's RFC determination is supported by substantial evidence, the ALJ erred in finding that plaintiff can perform his past relevant work.[20]

### CONCLUSION

For the foregoing reasons, the decision of the Commissioner is due to be reversed.[21]

A separate judgment will be entered.

Done, this 19th day of July, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[20]  The ALJ stopped the analysis at Step 4 and made no alternative Step 5 finding that plaintiff can perform "other work."  The court notes that the ALJ's hypothetical to the vocational expert omitted the few non-exertional limitations he included in plaintiff's RFC, so the VE's testimony would not, standing alone, have provided substantial evidence in support of a step 5 "other work" finding.

[21]  The court must reverse when the ALJ's legal analysis is flawed or his findings are not supported by substantial evidence. However, by reversing the decision, the court does not suggest that plaintiff is entitled to benefits on remand.